OSCAR L. RICHARD and Others, Copartners Trading as C. B. RICHARD & COMPANY, Respondents, v. AMERICAN UNION BANK, Appellant.

First Department, July 2, 1924.

Banks and banking — agreement to sell foreign exchange and transmit same by cable to foreign bank to buyer's credit — action to recover difference in exchange value at time credit should have been established and at time of notification of establishment thereof — contract not one for sale and delivery of commodity but executory contract only — contract was executed by transfer and placing to credit of plaintiff of sum contracted to be transferred though not performed within agreed time — plaintiff failed to allege special damage for delay in executing contract and general damage is not recoverable therefor — complaint is insufficient.

An agreement by a bank in consideration of a sum of money paid to it to sell foreign exchange and transmit the same by cable for the account of the buyer to a foreign bank at a specified time, is not a contract for the sale and delivery of a commodity but is an executory contract only.

Accordingly, a complaint in an action to recover the difference in exchange value between the value of the foreign exchange at the time it should have been established under such an agreement and at the time the buyer received notification that it had been established, which was after the date agreed on, is insufficient which does not allege any special damage sustained by the buyer by reason of the delay in carrying out the contract, for general damages are not recoverable therefor and there is no presumption that the buyer sustained any damage by reason of the delay.

APPEAL by the defendant, American Union Bank, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 26th day of April, 1924, denying the defendant's motion under rule 106 to dismiss the complaint for failure to state facts sufficient to constitute a cause of action.

The opinion of the Special Term is reported in *Richard* v. *American Union Bank* (123 Misc. Rep. 92).

*Lewis & Kelsey [Charles C. Pearce* of counsel], for the appellant.

*Max Silverstein,* for the respondents.

DOWLING, J.:

The complaint herein alleges two causes of action. The first cause of action alleges that at New York city, on November 14, 1919, two agreements were entered into between the plaintiffs and the Nemeth State Bank whereby the Nemeth State Bank, in consideration of the sum of $72,755 then paid to it by the plaintiffs, agreed to sell the plaintiffs 2,000,000 lei, and to transmit the same by cable forthwith for the account of the plaintiffs to a bank in Bucharest, Roumania, known as Banque Marmorosch Blank & Co., for plaintiffs' account on November 17, 1919; that the Nemeth State Bank would establish a credit in favor of said Banque Marmorosch Blank & Co., for and on behalf of the plaintiffs in the said sum of 2,000,000 lei; that the Nemeth State Bank wholly failed to deliver said 2,000,000 lei by cable to said Banque Marmorosch Blank & Co., at Bucharest; that the said Nemeth State Bank wholly failed and neglected to effect a credit available at Banque Marmorosch Blank & Co. for plaintiffs' account on November 17, 1919, in said sum of 2,000,000 lei or any part thereof; that thereafter on or about May 27, 1921, said Nemeth State Bank did deliver said 2,000,000 lei to said Banque Marmorosch Blank & Co. for plaintiffs' account and at said time effected a credit for plaintiffs' account in said Banque Marmorosch Blank & Co.; that notice of said payment and said credit was not given to the plaintiffs until August 17, 1921; that the market value of said 2,000,000 lei depreciated from November 17, 1919, when the same should have been transmitted and paid, to May 27, 1921, when the same was transmitted and paid, to plaintiffs' damage in the sum of $38,955, and thereafter depreciated further from said May 27, 1921, to August 17, 1921, when the same became available, in the further sum of $9,360; that the plaintiffs duly performed all the terms and conditions of said agreements on their part required to be performed; that the defendant succeeded to the assets and obligations of said Nemeth State Bank; that the aforesaid sums have been duly demanded from said Nemeth State Bank and from the defendant, and that no part thereof has been paid; and " that by reason of the premises plaintiffs have sustained damage in the sum of $48,315."

Similar allegations are incorporated in the second cause of action, which refers to an agreement at New York city on February 4, 1920, between the plaintiffs and Nemeth State Bank whereby the Nemeth State Bank, in consideration of the sum of $8,802.50, then paid to it by the plaintiffs, agreed to sell the plaintiffs 1,000,000

Jugo kronen, and to transmit the same by cable forthwith for the account of these plaintiffs to Vienna Bank Verein, Agram, Jugo-Slavia, to be payable there for plaintiffs' account on February 9, 1920; and in and by said agreement said Nemeth State Bank agreed to establish a credit in favor of said Vienna Bank Verein for plaintiffs' account on February 9, 1920; that the said Nemeth State Bank wholly failed and neglected to transmit or deliver said 1,000,000 Jugo kronen by cable to said Vienna Bank Verein; that said Nemeth State Bank wholly failed to establish said credit at said Vienna Bank Verein for plaintiffs' account on February 9, 1920, in said sum of kronen, or any part thereof; that thereafter on March 8, 1921, said Nemeth State Bank did transmit and deliver to said Vienna Bank Verein said 1,000,000 Jugo kronen, and at said time effected a credit in favor of said Vienna Bank Verein· for plaintiffs' account; that plaintiffs did not receive notice of said payment of credit until November 23, 1921; that the market value of said kronen depreciated from February 9, 1920, to March 8, 1921, in the sum of $2,000, and thereafter depreciated from March 8, 1921, to November 23, 1921, in the further sum of $3,752; that the plaintiffs duly performed all the terms of said agreement on their part to be performed; that the defendant succeeded to the assets and liabilities of said Nemeth State Bank; and that by reason of the premises, plaintiffs have sustained damage in the sum of $5,752.

The first question to be determined is whether the contracts in suit herein are for the sale ·and delivery of a commodity or are executory contracts only. As I read the latest decisions of the Court of Appeals, that question is settled, and the contracts in question are executory only. Thus in *Equitable Trust Company* v. *Keene* (232 N. Y. 290) Chief Judge HISCOCK said: " When we give to this descriptive language of the complaint a natural interpretation which avoids technicalities and rather finely spun shades of meaning, it seems to be clear that the agreement was not a .sale of any existing right or credit but was an agreement to place a certain amount of foreign money to the credit of the defendant, which necessarily related to the future whether measured by the celerity of a cable dispatch or by the delay of a communication by mail. The complaint which was made is to the effect that under the term ' cable transfer of exchange,' ' the person contracting to deliver such exchange ' contracts ' that he will make available by cable to the person contracting to take such exchange a credit of the amount specified at the point specified and at the time specified.' In such an agreement there is no guaranty or necessary implication that the contractor has any credit which he is selling or agreeing to sell or that he will place the credit through a third party as correspondent.

He can fulfill the terms of such an agreement through his branch office and he can after making the agreement create for himself the credit which will enable him to place to the credit of the other party to the agreement the funds in question. We are unable to see how such an agreement is other than a contract for future action, no matter how speedily accomplished, or how it can be a sale of an existing right. The principles involved are not different than those which would be applicable to a contract dealing with ordinary articles of personal property. An agreement transferring to another an existing stock of goods would be a sale; an agreement specially to manufacture or create for another certain articles would be a contract looking to the future. A party defaulting on either contract would, of course, be liable for damages. That liability would not be doubtful in such a case any more than it is here. We are not discussing that. We are simply concerned with the technical question whether the transaction here involved was a sale within the provisions of the Statute of Frauds* so as to require written evidence of its terms and, for the reasons stated, it seems to us that it was not."

It is sought to limit the effect of that decision by the fact that the complaint in the case was quite specific as to the details of the transaction in question; but as Chief Judge HISCOCK said in the same opinion (at p. 293): " The complaint defines with much preciseness not only the terms of the agreement but the nature of a transaction in foreign exchange by a cable transfer. We are limited in our views and decision by this statement and definition and it is, therefore, possible that such a transaction might be somewhat different in its nature and details than is alleged in this particular complaint although we are inclined to believe that the definition of the transaction as here given cannot be much different than that which would ordinarily be given to such a transfer of exchange." And that this belief was well founded is demonstrated by the records on appeal of such cases as have since come before us, based on contracts for either wireless or cable transfers of funds.

In *Gravenhorst* v. *Zimmerman* (236 N. Y. 22) the question of whether a wireless transfer transaction created an executory contract as distinguished from a sale, was presented squarely to the Court of Appeals. Chief Judge HISCOCK in his opinion said (at p. 29): " The transaction as evidenced by the agreement between the parties and as interpreted by the acts of the defendants in trying to effectuate their agreement, seems to us to contain certain fundamental features which cannot be eliminated and which give to the

---

* See Pers. Prop. Law, § 85, as added by Laws of 1911, chap. 571.— [REP.

contract the character of future performance, that is, make it executory rather than an executed sale and transfer. We are aided in determining what the undertaking is by clearly seeing what it is not.

" Concededly the defendants did not deliver to plaintiff's assignor any marks and did not set apart actual money which it then undertook for the account of the purchaser to transport and deposit to the credit of the designated payee in a given bank. Certainly no actual money passed from the banker to or for the account of the customer. But it has been urged that the customer purchased a contract to create a credit for its payee and that thus there was an executed sale. This seems to us to involve a mere redundancy of words. If a person made a contract with a carpenter whereby in consideration of the payment of a certain sum of money the latter agreed to build a house nobody we believe would think of calling this the purchase of a contract but would regard it as a simple contract whereby something was to be done in the future. The same reasoning seems to us to apply to the agreement in one of these transactions whereby the banker agrees to erect a credit for a given amount of foreign money."

And at page 31: " On the present appeal a strenuous effort is made to liken a transaction in foreign exchange to the purchase of a draft or bill of exchange and then to force the conclusion that because the latter transaction is regarded as a purchase or sale the former also must be stamped with that character. Assuming that there may be some similar features in the case of a purchased draft and of an order for the transmission of foreign exchange, we think there is no similarity between them in respect of the question which we are discussing. One who secures a draft obtains a written order by the drawer upon the drawee which by commercial usage and even by statutory enactment in some jurisdictions has come to be recognized as the symbol and equivalent of money and which enables the one who has obtained it without further action by the drawer to secure from the drawee the moneys which it represents. In consideration of the money paid by him he has actually obtained an instrument for the payment of money and which is regarded as its equivalent, and it is perfectly natural to speak of such a transaction as resulting in the executed purchase of a draft. A person who makes a contract for a credit in foreign exchange accomplishes no such result. He has secured nothing which will pass for money or which will enable him except through the action of the banker to obtain the exchange which he desires. It gives him no control whatever over the course of events which will lead to the establishment of the credit. The banker retains entire control of this and by his

future actions causes to be set up the credit which will eventually enable the customer to obtain the exchange in money which he desires.

" So, considering what the banker in a transaction like the present one does not do or attempt to do as well as that which he does do, it seems to us that in the final and accurate analysis his contract is that in consideration of the money paid to him he will create a credit for a given person of a given amount of the desired foreign money at a given place through orders dispatched by wireless and confirmed by mail to somebody who will obey his directions in setting up the credit and that thus his contract when he makes it is not an executed act but an executory agreement."

The general considerations applicable to cable or wireless transmissions of funds were well expressed by Dean Harlan F. Stone of Columbia Law School in his article on " Some Legal Problems Involved in the Transmission of Funds " (Vol. XXI, Columbia Law Review, p. 507), in the course of which he said (at p. 513): " When the transaction involves the banker's undertaking to procure the payment at a distant point the customer is often spoken of by bankers and in judicial opinion as having ' purchased ' exchange, but it is obvious that the term ' purchase ' when applied to such a transaction where the banker does not deliver a bill or draft to the customer is a mere figure of speech and all that the customer has actually purchased is the banker's undertaking or obligation to effect the payment at a distant point. The exchange transaction also often involves not only the payment of money at a distant point but payment of a different kind of money than that in use at the point where the money is received by the bank from the depositor. It is a convenient and hence customary method of describing such a transaction to speak of it as the purchase of the particular kind of money which is to be paid at the distant point. Thus the merchant or traveller who wishes to establish a credit in a foreign country and secures it by payment of money in dollars to his banker, speaks of having purchased pounds sterling, francs, or lire, as the case may be, although all that in fact or in law he has actually secured is some kind of an obligation by the banker to secure credit at the distant point payable in pounds, francs, or lire, as the case may be. Even when the obligation is performed and the credit is established, he is still only the owner of an obligation or chose in action, and not of any actual foreign money."

And again (at p. 520): "Although the reason for holding the banker's obligation to be contractual in the case of foreign exchange transactions is perhaps more obvious than in the case of transmission of funds from a debtor to a creditor where no foreign exchange

element is involved, the two transactions do not differ in any essential element, where the actual transaction of the identical money deposited is not contemplated. In either case the transmission of funds may be made effective by the banker, by the extension of his own credit in favor of the payee or by his acquisition of a credit with another bank in favor of the payee, the banker receiving in exchange the money deposited for the undertaking which he mingles with his general funds and uses as his own."

It follows from what has been quoted from the above decisions, that the contracts in question were executory only. Nor can they justly be compared to a transaction in which an international merchant here, for money received, gives an order for the delivery of an equivalent amount of grain or other fungible commodity abroad. In a cable transfer transaction the so-called " purchaser " receives no order, or anything similar to it, by which he can reduce to possession the designated amount of foreign exchange.

The Court of Appeals pointed out this distinction in the *Gravenhorst Case (supra)*, where it said (p. 31): " He [the plaintiff] has secured nothing which will pass for money or which will enable him except through the action of the banker to obtain the exchange which he desires. It gives him no control whatever over the course of events which will lead to the establishment of the credit. The banker retains entire control of this and by his future actions causes to be set up the credit which will eventually enable the customer to obtain the exchange in money which he desires."

The contract pleaded and sued on being executory in its nature, as settled by the decisions hereinbefore quoted from, it was in fact executed by the transfer and placing to plaintiffs' credit of the sums contracted so to be transferred and credited. Plaintiffs, therefore, actually got what they paid for, and defendant carried out its agreement, though not at the time fixed.

Under the first cause of action, the credit was to have been established on November 17, 1919, but was not actually established until May 27, 1921, and plaintiffs were not advised thereof until August 17, 1921. Under the second cause of action, the credit was to have been established on February 9, 1920, but was not in fact established until March 8, 1921, and plaintiffs were not notified thereof until November 23, 1921. The damages claimed are the difference between the market value of the foreign currency at the the time when performance should have been made, and at the time when it was actually had, and the further date when plaintiffs received notice thereof.

But plaintiffs have failed to allege any special damage sustained by them by reason of the delay in carrying out the contract, and

general damages are not recoverable therefor, nor is there any presumption that the plaintiffs sustained any damage by reason of the delay, since they ultimately received exactly what they bargained for — the effectuation of credits for a definite amount of lei and kronen at the banks agreed upon.

In *Strohmeyer & Arpe Co.* v. *Guaranty Trust Co.* (172 App. Div. 16) the plaintiff purchased a cable transfer in the amount of 75,000 lire, payable in Genoa, Italy, for the account of designated beneficiaries. The contract was entered into between the parties on October 23, 1914, and the defendant instructed its correspondent, Credito Italiano, Genoa, Italy, to effectuate the transfer. The cable message was transmitted to Europe by the French Telegraph Cable Company on the evening of October 23, 1914, but was never delivered to the defendant's correspondent at Genoa. On November 9 or 10, 1914, the plaintiff advised the defendant that it had received word from the beneficiaries that the cable transfer had not arrived. The defendant thereupon promptly cabled the Credito Italiano at Genoa a repetition of the cable of October twenty-third. This cable message was delivered to the Credito Italiano on November 11, 1914, and payment was at once effected to the beneficiaries. The parties stipulated the market value of a cable transfer of the 75,000 Italian lire payable in Genoa, Italy, on the contract date and on the date of actual delivery. The plaintiff sued to recover the difference between the contract price of the cable transfer and the market price as of the date of actual payment, plus interest on the sum of United States currency paid to the defendant by the plaintiff on October 23, 1914.

Mr. Justice SCOTT there said (at p. 20): " The transaction was a completed one, and plaintiff or its correspondent ultimately received precisely what defendant engaged should be received, to wit, 75,000 lire in Genoa. The inequity of plaintiff's claim can be appreciated by considering what would have been the rights of the parties if the fluctuations of exchange had been such that on November eleventh, the value of one dollar in Italian lire had been more than five and two-tenths instead of less, and that, as in the present case, the delay in transmission had been due to no fault of the defendant. In such a case it is evident that defendant having sold the transfer at five and two-tenths on October twenty-third, would have had no valid claim against plaintiff for the value of the transfer at the market rate on November eleventh.

" As we regard the transaction it was complete on October twenty-third when the cable transfer was sold. The money paid for it became defendant's money against which plaintiff received defendant's obligation that payment would be made in Genoa. For a

First Department, July, 1924. [Vol. 210

failure to comply with this obligation plaintiff might, under some circumstances, although not under those in this case, have an action for damages. The judgment appealed from must be reduced to the sum of twenty dollars and forty-two cents, with interest from November 11, 1914, to June 14, 1915, and as so modified affirmed, with costs to the appellant in all courts."

In other words, this court only approved the recovery of damages measured by interest on the sum of United States currency paid for the transfer from the date of payment thereof to the date when exchange was actually delivered by the defendant, to wit, the loss of use of the United States currency in question pending delivery of the stipulated sum of foreign exchange. But there the loss of this interest was specifically pleaded as an element of damage, which is not the case in the complaint now before us.

Applying the reasoning of the *Strohmeyer* case to the case now under consideration, plaintiff's transactions with defendant were completed when the credits were ultimately established, even though they were not consummated until long after the contractual date. But plaintiffs did not seek to rescind the transactions. They sue for their damages. But these damages cannot be general in their nature. They must be special damages and must be pleaded. Such special damages may consist in: *First*, interest on the amount paid for the foreign exchange as determined by the *Strohmeyer Case* (*supra*), if specially pleaded; *second*, special damages sustained by reason of defendant's failure to make timely performance of its executory contract. These would be supported by appropriate allegations of damage done to plaintiffs by reason of the delay in performance. Thus, if it was alleged that the transfers had been bought in order to meet outstanding commitments, or to pay debts about to mature, or to fulfill contractual obligations; and that by reason of the failure of defendant to effectuate delivery it became necessary for the plaintiffs to purchase an equivalent amount of the foreign money at an increased cost in order to meet their obligations; or that plaintiffs had lost the value of their contracts by a failure of defendant to establish the credit as agreed; in such a case a basis would be laid for the recovery of special damages. All assuming, of course, that defendant had knowledge of these conditions when the original exchange was bought.

The present complaint fails to state facts from which any damages sustained by plaintiff can properly be inferred, since there is no presumption, in such a transaction as that sued on, of general damage, and no facts are pleaded constituting special damage.

The order appealed from should, therefore, be reversed, with ten dollars costs and disbursements, and the motion granted, with

ten dollars costs, with leave to plaintiffs to serve an amended complaint within twenty days from service of the order to be entered hereon upon payment of said costs.

CLARKE, P. J., SMITH, McAVOY and MARTIN, JJ., concur.

Order reversed, with ten dollars costs and disbursements, and motion granted, with ten dollars costs, with leave to plaintiffs' to serve an amended complaint within twenty days from service of order upon payment of said costs.